**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RAYMOND W. DEMATTEO, | ) | |
| | ) | |
| Plaintiff, | ) | 2:09-cv-1588 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

**NORA BARRY FISCHER, District Judge**

**I.       INTRODUCTION**

Plaintiff Raymond Dematteo ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The parties have filed cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level. (Doc. Nos. 6, 8). For the following reasons, the Court finds that the decision of the ALJ is supported by substantial evidence; therefore, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

**II.       PROCEDURAL HISTORY**

Plaintiff filed his application for DIB on October 19, 2006, alleging disability since July 1, 2006 due to blindness in his right eye and poor vision in his left eye.[1] (R. 134, 153). Plaintiff's claim was denied at the initial level on February 9, 2007. (R. 95). He requested a hearing before an Administrative Law Judge ("ALJ") on April 12, 2007. (R. 102). A hearing was held on July 8, 2008 before ALJ John J. Mulrooney, II. (R. 56-91). Plaintiff, who was represented by counsel, and Judy Schollaert, a vocational expert, testified. *Id*. On August 11, 2008, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (R. 17-26). The Appeals Council subsequently denied Plaintiff's request for review, thereby making the decision of the Commissioner final in this case. (R. 1). Plaintiff now seeks review of that decision by this Court.

**III.      STANDARD OF REVIEW**

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 522, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). As long as the Commissioner's decision is supported by substantial evidence, it

---

[1] Citations to Docket No. 4, the record, are hereinafter in the form: "(R. __)."

cannot be set aside, even if this court "would have decided the factual inquiry differently." *Haranft v. Apfel,* 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents [her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec'y of Health and Human Servs.,*841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. §423 (d)(1). A claimant is considered unable to engage in substantial gainful activity "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §423 (d)(2)(A).

An ALJ must do more than simply state factual conclusions to support his ultimate findings. *Baerga v. Richardson,* 500 F.2d 309, 312-13 (3d Cir. 1974). The ALJ must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). Moreover, the ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rule making authority under 42 U.S.C. §405(a), has promulgated a five-step sequential evaluation process to determine whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court summarized this process as follows:

If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520 (b), 416.920 (b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 415.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [20 C.F.R.] §§ 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. [20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-5, 124 S.Ct. 176, 157 L.Ed. 2d 333 (2003)(footnotes omitted).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiff's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Heckler v. Campbell*, 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d 775, 777 (3d Cir. 1987); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

**IV.     FACTS**

        **A.     General Background**

4

Plaintiff was born on May 2, 1951, making him fifty-seven years of age at the time of the ALJ's decision. (R. 134). A fifty-seven year old is considered a "person of advanced age" under 20 C.F.R. § 416.920(e). Plaintiff completed high school and had previously been employed as a bakery truck driver for twenty-seven years. (R. 153). He retired from that work in May 2006. *Id*. Plaintiff avers July 1, 2006 as the onset of his disability. (R. 149).

### B.    Medical Background

Plaintiff claims to be disabled based on severely decreased vision in both eyes due to retinal detachment in the right eye, severe obstructive sleep apnea syndrome, high blood pressure, and hyperlipidemia. (Plaintiff's Brief, Doc. No. 7, p. 2). Plaintiff underwent cataract[2] surgery in 2005 and retired from his long-term employment in May 2006 for reasons unrelated to his vision problems. (R. 75-76).

On December 14, 2005, Plaintiff sought treatment with Dr. Bharat Jain, a sleep specialist, for difficulty sleeping and snoring. (R. 197). Plaintiff underwent a formal sleep study on January 31, 2006 and was diagnosed with moderate to severe sleep apnea syndrome.[3] (R. 195). Frequent respiratory disturbances were recorded during the test despite the use of a

---

[2]      A cataract is a clouding of the lens of the eye. National Institutes of Health/U.S. National Library of Medicine, "Cataract," *available at*: http://www.nlm.nih.gov/medlineplus/cataract.html (last visited May 3, 2010).

[3]      Sleep apnea syndrome is a common disorder where an individual's breathing stops or shallows for 10-20 second periods during sleep. National Institutes of Health/U.S. National Library of Medicine, "Sleep Apnea," *available at*: http://www.nlm.nih.gov/medlineplus/sleepapnea.html (last visited May 5, 2010).

continuous positive airway pressure ("CPAP") machine.[4] *Id*. He was prescribed a CPAP

machine for nightly use. (R. 196).

In July 2006, Plaintiff began experiencing significant vision problems in his right

eye. (R. 76).  Plaintiff was diagnosed with a detached retina[5] and vitreous hemorrhage[6] by Dr.

Robert Lewen, his treating ophthalmologist. (R. 209). On July 7, 2006, Plaintiff underwent a

pars plana vitrectomy[7] with internal drainage of subretinal fluid, focal endolaser

photocoagulation[8], scleral buckle[9] and gas-fluid exchange in his right eye to correct the

---

[4]

CPAP is a treatment that delivers slightly pressurized air during the breathing cycle. National Institutes of Health/U.S. National Library of Medicine, "Nasal CPAP," *available at*: http://www.nlm.nih.gov/medlineplus/ency/article/001916.htm  (last visited May 3, 2010).

[5]

The retina is the nerve layer in the back of the eye and ceases to work when it is pulled away or detached from its normal position.  American Academy of Ophthalmology, "Detached and Torn Retina," *available at*: http://www.eyecareamerica.org/eyecare/conditions/retinal-detachment/index.cfm (last visited May 3, 2010).

[6]

Vitreous hemorrhage is bleeding into the clear gel (vitreous) that fills the eyeball between the retina and the lens. National Institutes of Health/U.S. National Library of Medicine, "Eye and orbit ultrasound," *available at*: http://www.nlm.nih.gov/medlineplus/ency/article/003797.htm (last visited May 3, 2010).

[7]

Vitrectomy is used to treat a variety of blinding disorders, most commonly proliferative diabetic retinopathy, complex retinal detachment, macular hole, and epiretinal membrane (also known as macular pucker). Various microsurgical instruments are introduced into the eye cavity to cut or peel away scar tissue, excise blood, or apply laser treatment. University of Medicine and Dentistry of New Jersey, "Vitrectomy," *available at*: http://njms2.umdnj.edu/eyeweb/faqs/vitrect.html  (last visited May 3, 2010).

[8]

Focal photocoagulation employs the use of a laser to stop blood vessels from leaking into the macula. American Diabetes Association, "Eye Complications," *available at*: http://www.diabetes.org/living-with-diabetes/complications/eye-complications.html (last

(continued...)

problems. *Id*. Plaintiff had a follow-up appointment on July 18, 2006 at which time Dr. Lewen

noted that Plaintiff was doing very well with 20/200 vision in his right eye.[10] (R. 234). In

August 2006, Dr. Lewen's findings were similar, with Plaintiff's right eye vision improving to

20/70. (R. 233).

Plaintiff was examined again by Dr. Lewen, on an emergency basis, on September 7,

2006. (R. 296). Dr. Lewen found that Plaintiff's right retina had suffered extensive cellophane

maculopathy and a gross macular pucker.[11] *Id*. His vision had decreased from 20/400, two days

prior, to hand motion only. *Id*. On the next day, Plaintiff underwent a vitrectomy and epiretinal

membrane peeling[12] to attempt to correct the difficulties. (R. 210). In late September, Plaintiff

---

[8](...continued)
visited May 3, 2010).

[9]

    A scleral buckle is a flexible band placed around the eye to counteract the forces
pulling the retina out of place. American Academy of Ophthalmology, "Detached and Torn
Retina," *available at*:
http://www.eyecareamerica.org/eyecare/conditions/retinal-detachment/index.cfm (last visited
May 3, 2010).

[10]

    Individuals whose visual acuity is measured as between 20/200 and 20/400 are
considered to have severe visual impairment or severe low vision. American Optometric
Association, "Low Vision," *available at*: http://www.aoa.org/low-vision.xml (last visited May
3, 2010).

[11]

    Macular pucker or cellophane maculopathy occurs when scar tissue forms on the
eye's macula in the center of the retina. National Eye Institute/National Institutes of Health,
"Macular Pucker," *available at*: http://www.nei.nih.gov/health/pucker/pucker.asp (last visited
May 3, 2010).

[12]

    Epiretinal membrane peeling (for the treatment of cellophane maculopathy or
macular pucker) is a surgery where the membrane of the retina is peeled off and removed.
Good Hope Eye, "Epiretinal Membrane," *available at*:

(continued...)

developed further difficulties, including reaccumulation of subretinal fluid on the right side,

consequent to a retinal break associated with his previous retinal detachment and in the left eye,

lattice degeneration and multiple atrophic-type holes.[13] (R. 295). On September 26, 2006,

Plaintiff underwent a third procedure involving focal laser photocoagulation to the retinal holes

and detachment of the left eye and a pars plana vitrectomy with epiretinal membrane peeling,

internal drainage of subretinal fluid, focal endolaser photocoagulation and silicone oil infusion

in the right eye. (R. 211). Dr. Lewen noted that the two September procedures to the right eye

were a direct result of scar tissue formation and its associated complications. (R.  295).

On October 2 and 10, 2006, Dr. Lewen recorded Plaintiff's visual acuity as 20/400 in

his right eye and 20/20 to 20/25 in his left eye. (R. 217-218). Plaintiff reported flashes,

fluttering, photophobia and sporadic headaches. *Id*. On November 20, 2006, Plaintiff reported

that his right eye vision was blurred, and his right eye visual acuity was 20/400. (R. 215). He

noted that his vision fluctuated in his left eye with floaters[14] and flashes. *Id*.  Plaintiff was

examined by Dr. Lewen again on January 9, 2007, at which time he reported that his vision was

---

[12] (...continued)
http://www.goodhope.org.uk/departments/eyedept/ermpeel.htm (last visited May 3, 2010).

[13]

Lattice degeneration presents as a linear trail of fibroseed vessels that appear in a "lattice" pattern within the retina. Atrophic holes are often present within the "lattice" lesion. Handbook of Ocular Disease Management, "Lattice Degeneration with and without atrophic holes," *available at*: http://cms.revoptom.com/handbook/sect5e.htm (last visited May 3, 2010).

[14]

Floaters are "cobwebs" or specks that float around in an individual's field of vision and may appear like spots, thread-like strands, or lines. They do not follow eye movements precisely. National Eye Institute/National Institutes of Health, "Floaters," *available at*: http://www.nei.nih.gov/health/floaters/floaters.asp (last visited May 3, 2010).

blurry with some irritation, especially at the end of the day, with flashes and floaters. Visual acuity was measured as 20/400 in the right eye and 20/40[15] in the left. (R. 264). On January 18, 2007, Dr. Lewen removed the silicone oil that had been placed in Plaintiff's right eye during a previous surgery. (R. 262).

On January 1, 2007, Plaintiff's records were reviewed by Dr. Raymond Dalton, a psychiatrist. (R. 249). Dr. Dalton determined that Plaintiff had no medically determinable mental impairment. *Id*.

Plaintiff was re-examined by Dr. Lewen on February 23, 2007 and reported no vision changes in his right eye but continued blurriness, and blurred spots in his left eye vision. (R. 317). At a further follow-up on May 22, 2007, Plaintiff reported no changes since his prior appointment. (R. 315). He reported flashes and floaters in his visual field and vision that was "blurred at times" in his left eye. *Id*. His visual acuity was noted as 20/400 in the right eye and 20/30 in the left eye. *Id*. On July 26, 2007, Plaintiff reported that he was experiencing a few floaters and flashes in the left eye and a few days with blurry spots with a "cloud" going back and forth in his vision. (R. 313). His right eye was noted as stable with 20/400 vision. *Id*. His left eye was noted as 20/50. *Id*. On July 31, 2007, Plaintiff reported minimal improvement in his left eye. (R. 312).

On August 27, 2007, Plaintiff continued to report issues with a "blurry cloud" floating in front of his central vision and occasional flashes and floaters. (R. 311).  Visual

---

[15]

20/30 to 20/60 is considered mild vision loss or near-normal vision. American Optometric Association, "Low Vision," *available at*: http://www.aoa.org/low-vision.xml (last visited May 3, 2010).

acuity was noted as 20/400 in the right eye and 20/25 in the left eye. *Id*.  On November 20, 2007, Plaintiff continued to report blurriness and floaters. (R. 309). Visual acuity was noted as 20/400 in the right eye and 20/30 in the left eye. *Id*. At his final examination of record on March 25, 2008, plaintiff reported some blurring in the right eye. (R. 336). Visual acuity was noted as 20/400 in the right eye and 20/40 in the left. *Id*.

At the Appeals Council level, Plaintiff submitted a letter composed by Dr. Lewen indicating that Plaintiff's vision remained at 20/400 in the right eye and 20/30 in the left with large vitreous floaters present. (R. 51). Dr. Lewen noted that plaintiff was "visually compromised" due to his 20/30 vision in the left eye and lack of good depth perception. *Id*. He opined that the good vision in plaintiff's left eye could be "intermittently compromised due to the large vitreous floaters." *Id*.

### C.    Administrative Hearing

At the hearing, Plaintiff appeared with the assistance of counsel, Michael Quatrini, Esq. (R. 56).  Plaintiff testified that he did not believe he could work outside of the home due to his vision. (R. 65). He reported that his eyesight in the left eye was very poor and blurry and that the vision in his left eye was affected by floaters and "very poor" depth perception. (R. 66, 75, 79, 82). He noted that lighting affected his vision. (R. 86). Plaintiff indicated that, due to his vision problems, he was no longer driving but could do yard work, cut the grass, shovel snow, go to the store, carry light grocery bags, do the dishes, do laundry, take out the trash, watch television, look at stocks on the computer, play mushball in the pool with his son, and take care of his pool. (R. 67-70, 74, 83). He also noted that he could read the paper, books, and magazines, but that it would take him "awhile." (R. 70-71). In addition, he noted that he went

10

to church, could determine what he wanted from a menu at a restaurant, and had recently spent time in Atlantic City for his anniversary. (R. 73).

Plaintiff also testified that he used his CPAP machine and that it controlled his snoring. (R. 85). He noted, however, that he was not getting a good night's sleep, which he attributed to worrying about "how the next bill is going to get paid or how ... I am going to be able to see tomorrow or is my eye going to get worse." *Id*.

At the conclusion of Plaintiff's testimony, the ALJ proposed a hypothetical question to the vocational expert, Judy Schollaert.[16] (R. 86). The ALJ proposed a hypothetical person who was limited to occupations that did not require bilateral visual acuity; the need to estimate or rely on depth perception during the workday; operate a motor vehicle during working hours; or involve exposure to dangerous machinery, unprotected heights, or climbing on ropes, ladders, and scaffolds. (R. 87-88). The vocational expert testified that an individual with these limitations could perform the jobs of kitchen helper and hospital housekeeper. (R. 88). She also testified that these jobs existed in significant numbers in the national and local economies. *Id*.

## V.   DISCUSSION

The ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act. The ALJ reached this decision after applying the five step framework for analysis

---

[16]    Plaintiff stipulated to Ms. Schollaert's professional qualifications during the hearing. (R. 86). Schollaert's C.V. states that she attained a Bachelors of Science in Social Work from California University of Pennsylvania as well as a Masters in Counseling Services from Indiana University of Pennsylvania. (R. 127). She is currently employed as an independent contractor, vocational expert. *Id*.

summarized in *Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

### A.     The Five Step Analysis

Under the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 1, 2006, the application date. (R. 19). At step two, the ALJ made a determination that Plaintiff suffered from the following severe impairments under the standards set forth in 20 C.F.R. § 405.1520 (c): status post bilateral cataract surgeries in later 2005, pseudophakic right eye, status post July 7, 2006 retinal repair and two September 2006 follow-up surgeries. *Id*. In the third step, the ALJ determined that none of Plaintiff's medical impairments met or equaled any impairment listed in 20 C.F.R. Pt. Subpt. P, App. 1 (the "Listing of Impairments"). (R. 21).

Next, the ALJ determined that Plaintiff's current residual functional capacity did not allow him to return to his past relevant work. (R. 24). Accordingly, at step four the ALJ made the following residual capacity assessment:

> After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform work-related activities at all exertional levels (including "sedentary,""light,""medium,"and "heavy"). Additionally, the claimant is limited to occupations which do not require bilateral visual acuity, the need to estimate or rely on depth perception during the work day, operation of a motor vehicle during working hours, exposure to dangerous machinery or unprotected heights, or climbing on ladders, ropes, or scaffolds.

 (R. 22). The ALJ further found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Plaintiff's statements

concerning the intensity, duration and limiting effects of these symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment. (R. 24).

Finally, under step five, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could have performed. (R. 25). Accordingly, the ALJ found that a finding of "not disabled" was appropriate under the Social Security Act. (R. 26).

**B.      Issues Before This Court**

Plaintiff makes several arguments suggesting that the ALJ erred in his reasoning. First, Plaintiff argues that the ALJ erred is his formulation of residual functional capacity by failing to take into account the effect of floaters in Plaintiff's left eye. (Pl.'s Brief at 6-8). Second, he also contends that the ALJ relied on sporadic daily activities in support of his conclusions. *Id.* at 8. Third, Plaintiff argues that his testimony was mischaracterized to support the ALJ's conclusions. *Id.* at 8-9. Fourth, Plaintiff argues that the residual functional capacity and hypothetical question posed to the vocational expert did not include all physical and vocational limitations that were supported in the record.  *Id* at 10. Fifth, Plaintiff suggests that the ALJ erred in his assessment of Plaintiff's credibility. *Id*. at 10-11. Sixth, Plaintiff contends that the ALJ erred in rejecting cross-examination questions posed by Plaintiff's counsel at the hearing. *Id*. at 12. Finally, Plaintiff argues that the ALJ's decision incorporates flawed vocational expert testimony. *Id*. at 13-14. To the contrary, the Defendant argues that the ALJ's determination was supported by substantial evidence. (Def.'s Brief at 8-15).

**C.      Residual Functional Capacity Determination and Hypothetical Question**

Plaintiff argues that the ALJ improperly determined his residual functional capacity, which led to an incomplete hypothetical question being presented to the vocational expert. Plaintiff specifically argues that the ALJ failed to discuss the effect of floaters on the vision in his left eye and failed to include that his vision was affected by low levels of light. (Pl.'s Brief at 6-11).

"'Residual functional capacity' [RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). A claimant's RFC represents the most, not the least, that a person can do despite his or her limitations. *See Cooper v. Barnhart*, Civ. A. No. 06-2370, 2008 WL 2433194, at *2 n.4 (E.D.Pa. June 12, 2008) (citing 20 C.F.R. § 416.945(a)). In determining a person's RFC, an administrative law judge must consider all evidence of record. 20 C.F.R. § 416.920. Although an administrative law judge can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so. *Id.* As the court stated in *Burnett*, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Id.* at 121 (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

In this Court's estimation, the ALJ properly formulated the hypothetical question to the vocational expert and determined Plaintiff's residual functional capacity. Plaintiff suggests that the ALJ failed to take into account the effect of floaters on Plaintiff's left eye vision. He concedes that the raw visual acuity score of between 20/25 and 20/40 in the left eye does not

14

qualify Plaintiff for benefits, but instead argues that the floaters disrupt normal vision in the left

eye on a regular basis. (Pl. Brief at 7). The ALJ, however, properly relied on the evidence of

record. The record indicates that Plaintiff began reporting floaters in the left eye around

November 2006. (R. 215). These spots or "clouds" caused his vision to be "blurred at times."

(R. 313, 315). Despite these floaters, Plaintiff's uncorrected visual acuity in the left eye

remained between 20/25 and 20/50 from October 2006 through March 2008, indicating

minimal vision loss to near-normal vision. (R. 217-218, 264, 309, 311, 313, 315, 336). There is

no evidence of record that suggests these floaters affected Plaintiff's vision on more than an

intermittent basis or that his visual acuity scores did not accurately reflect his visual abilities.

*Id*.

Plaintiff relies, in part, on new evidence submitted at the Appeals Council level in

the form of Dr. Lewen's September 2008 letter. Despite suggestions to the contrary, Dr.

Lewen's letter does not put forth a materially new or different opinion on the effect of the

floaters on Plaintiff's visual acuity.[17]  Dr. Lewen's letter simply suggests that the good vision in

---

[17]

The United States Court of Appeals for the Third Circuit has set forth guidelines for determining when a "new evidence" remand is proper under § 405(g): "[T]he evidence must first be "new" and not merely cumulative of what is already in the record. Second, the evidence must be "material;" it must be relevant and probative.... Beyond that, the materiality standard requires that there be a reasonable possibility that the new evidence would have changed the outcome of the [Commissioner's] determination. Finally the claimant must demonstrate good cause for not having incorporated the new evidence into the administrative record." *Szubak v. Secretary of Health and Human Servs.,* 745 F.2d 831, 833 (3d Cir.1984) (citations omitted); *see also Cruse v. Astrue*, 2010 WL 1133423, * 4-5 (W.D.Pa. March 23, 2010)(where a physician's report did not set forth opinions relating to physical limitations or inability of the claimant to work, there is no reasonable probability that it would have changed the outcome of the case.)  In order to satisfy the "materiality" requirement, "the new evidence [must] relate to the time period for which benefits were denied, and [must] not concern

(continued...)

Plaintiff's left eye could be "intermittently compromised due to large vitreous floaters." (R. 51). This opinion does not differ from the findings of Plaintiff's eye examinations, which exhibit slight fluctuations between 20/25 and 20/50 in the left eye. These findings do not correspond with sustained or significant difficulties with left eye vision, and in fact, Dr. Lewen made no suggestion that the floaters would considerably compromise left eye vision. As a result, it is evident that the ALJ properly discussed the impact of Plaintiff's floaters on his visual acuity and a remand is not necessary based on this repetitive evidence.

Plaintiff similarly argues that the ALJ failed to incorporate a limitation on Plaintiff's ability to function in low levels of light. (Pl. Brief at 10). Plaintiff testified at the hearing that his visual abilities are affected by light levels. Plaintiff suggests that this testimony is supported by the September 2008 letter of Dr. Lewen stating, "the good vision in his left eye may be intermittently compromised due to the large vitreous floaters.  This *might* especially be the case at night" (R. 51)(emphasis added). Once again, this letter was not submitted until the Appeals Council level, and the relied upon statement does not suggest a degree of certainty in the acuity difference between the low light and standard light levels. There is no support elsewhere in the record of increased impairment due to low level lighting. As a result, it was not improper for the ALJ to omit this proposed limitation from the hypothetical question and residual functional capacity.

In this Court's estimation, the residual functional capacity assessed by the ALJ and in turn, the hypothetical question posed to the vocational expert were supported by substantial

---

<sup>17</sup>```(...continued)```
evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id.*

evidence. Plaintiff's medical records and Plaintiff's testimony support the residual functional capacity and hypothetical question as assessed.

### D.       Plaintiff's Credibility

Plaintiff also argues that the ALJ failed to properly assess his credibility. (Pl.'s Brief at 8-12). Specifically, Plaintiff contends that the ALJ improperly relied on sporadic daily activities when assessing credibility and mischaracterized other evidence of daily activities. *Id*. at 8-9. Plaintiff further maintains that the ALJ improperly suggested that Plaintiff was lying when he testified that he can no longer drive a car. *Id*. at 10-12.

The ALJ must give serious consideration to the claimant's subjective complaints, even when those assertions are not fully confirmed by objective medical evidence. *See Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir.1993); *Welch v. Heckler,* 808 F.2d 264, 270 (3d Cir.1986).   Pain alone, if sufficiently severe, may be a disabling impairment that prevents a claimant from performing any substantial gainful work. *E.g., Carter v. Railroad Retirement Board,* 834 F.2d 62, 65, *relying on Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984); *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir. 1981); *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979). Similarly, an ALJ must give great weight to a claimant's subjective description of his or her inability to perform even light or sedentary work when this testimony is supported by competent evidence. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999), *relying on Dobrowolsky.*

Where a medical impairment that could reasonably cause the alleged symptoms exists, the ALJ must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work.  This obviously requires the ALJ to

17

determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.   *See* 20 C.F.R. § 404.1529(c).  *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). If an ALJ concludes that the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision.  *See Cotter*, 642 F.2d at 705. The Court of Appeals has stated:

> in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations.  The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work.

*Schaudeck*, 181 F.3d at 433.  However, as long as a logical explanation is provided between the evidence accepted and the conclusion, the ALJ need not mention every piece of evidence in the record. *Beety-Monticelli v. Commissioner of Social Security*, 343 Fed.Appx. 743, 747 (3d Cir. 2009).

In his opinion, the ALJ discussed Plaintiff's testimony regarding his daily activities and abilities and determined that Plaintiff's testimony was not entirely credible. (R. 24). As noted above, Plaintiff testified that he could do yard work, cut the grass, shovel snow, go to the store, carry light grocery bags, do the dishes, do laundry, take out the trash, watch television, look at stocks on the computer, play mushball in the pool with his son, and take care of his pool. (R. 67-70, 74, 83). He also noted that he could read the paper, books, and magazines, but that it would take him "awhile." (R. 70-71). In addition, he noted that he went to church, could determine what he wanted from a menu at a restaurant, and had recently spent time in Atlantic City for his anniversary. (R. 73). Plaintiff suggests that these activities are "sporadic" and

18

cannot be utilized in assessing his credibility. While Plaintiff suggests that the ALJ improperly utilized this evidence, there is no suggestion from the testimony that these activities were sporadic. Plaintiff plainly testified that he could perform these activities.

Plaintiff also contends that the ALJ mischaracterized some of his testimony by failing to include all of the facts suggested by Plaintiff. Plaintiff argues that the ALJ should have discussed Plaintiff's need to move floaters out of his field of vision while reading or watching television; mentioned that Plaintiff's father-in-law drove him to Atlantic City for their trip; and explained that Plaintiff plays mushball because playing catch with a hard object can result in Plaintiff getting hit in the face. Despite Plaintiff's arguments, the ALJ properly discussed the testimony and medical evidence regarding Plaintiff's floaters. He also throughly discussed the remainder of Plaintiff's testimony. The ALJ relied on the activities that Plaintiff testified he could do, including playing mushball with his son and taking a trip to Atlantic City with his wife and father-in-law. It is evident that the ALJ took into account Plaintiff's inability to drive and difficulties with depth perception, as these two limitations were specifically included in residual functional capacity. (R. 21-22). As such, his explanations were not in error.

Plaintiff next argues that the ALJ erred in suggesting that Plaintiff was being less than truthful when he stated he could not drive. In his opinion the ALJ stated, "I believe that the [claimant]... continues to drive, despite any impairment related to his vision." (R. 23). In support of this assertion, the ALJ relied on Plaintiff's testimony that he continued to maintain insurance on cars for every member of the family and had a car for every member of the family. *Id*. While the Court notes that the ALJ's reasoning on this issue is flawed because there is no actual evidence that Plaintiff continued to drive, other substantial medical and testimonial

19

evidence supports the conclusion that Plaintiff's testimony as to his limitations was not entirely credible. As discussed above, the ALJ properly concluded, based on the medical evidence, that Plaintiff maintained sufficient vision in his left eye to perform sustained work with the limitation that he could not drive while working. He also properly relied on Plaintiff's testimony that he could still perform significant chores both inside and outside of his home and was active with his family. As a result, the ALJ's credibility determination is supported by substantial evidence.

### D.   Vocational Expert Testimony and Cross-Examination

Finally, Plaintiff argues that the decision of the ALJ should be reversed based on the ALJ's failure to discount testimony elicited by Plaintiff's cross-examination of the vocational expert and explain his reliance on flawed vocational testimony. (Pl.'s Brief at 12-14). Plaintiff suggests that several questions posed by his counsel regarding the tools utilized to perform the jobs and the requirements of the jobs of kitchen helper and hospital housekeeper were used to display problems arising from Plaintiff's impaired depth perception. Plaintiff also suggests that the vocational expert testimony testified that the job kitchen helper did not require the use of a knife, when that was in fact a requirement listed by the Dictionary of Occupational Titles.

Plaintiff first suggests that the vocational expert's testimony conflicted with the Dictionary of Occupational Titles listing for the job "kitchen helper." This argument, however, has no merit. The Dictionary of Occupational Titles lists various combinations of duties to be performed by a kitchen helper. One of the listed duties could include "wash[ing] and peel[ing] vegetables, using knife or peeling machine," however, this is only one of many duties that a

kitchen helper could be asked to perform.[18] *See Dictionary of Occupational Titles*, 4th Ed. (Rev. 1991). When asked whether a kitchen helper would be required to use a knife, the vocational expert stated, "[n]ot necessarily, no." (R. 89). This testimony is not inconsistent with the Dictionary of Occupational Titles and therefore, required no explanation by the ALJ.

The court likewise finds no merit to Plaintiff's contention that the ALJ erred in not accepting the vocational expert's responses to the questions posited by Plaintiff's attorney which incorporated additional limitations and attempted to suggest that Plaintiff could not perform the stated jobs. Plaintiff maintains that if he were required to use a knife, handle glasses or dishes, guide a laundry cart or buffer, or avoid other people or equipment, he would be unable to perform the stated jobs. (Pl.'s Brief at 12-13).

As already discussed, the limitations stated in the ALJ's residual functional capacity finding, which he incorporated into his hypothetical question to the vocational expert, are all of the limitations that are supported by the evidence of record. The vocational expert testified that

---

[18]
     The listing of Kitchen Helper 318.687-010 is as follow: "Performs any combination of following duties to maintain kitchen work areas and restaurant equipment and utensils in clean and orderly condition: Sweeps and mops floors. Washes worktables, walls, refrigerators, and meat blocks. Segregates and removes trash and garbage and places it in designated containers. Steam-cleans or hoses-out garbage cans. Sorts bottles, and breaks disposable ones in bottle-crushing machine. Washes pots, pans, and trays by hand. Scrapes food from dirty dishes and washes them by hand or places them in racks or on conveyor to dishwashing machine. Polishes silver, using burnishing-machine tumbler, chemical dip, buffing wheel, and hand cloth. Holds inverted glasses over revolving brushes to clean inside surfaces. Transfers supplies and equipment between storage and work areas by hand or by use of handtruck. Sets up banquet tables. Washes and peels vegetables, using knife or peeling machine. Loads or unloads trucks picking up or delivering supplies and food." *Dictionary of Occupational Titles,* "318.687-010 Kitchen Helper," *available at:* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT03A.HTM  (last visited May 5, 2010).

Plaintiff was able to perform these jobs despite the inability to estimate or rely on depth perception during the work day. To the extent Plaintiff's counsel suggested additional limitations in his questions to the vocational expert, they are not medically supported and are contradicted by Plaintiff's testimony as to his daily activities. Plaintiff, in fact, testified that he was capable of mowing the lawn, which suggests an ability to maneuver a heavy moveable object; go shopping at the store; and do dishes, which suggests the ability to handle glasses and dishes. As a hypothetical to the vocational expert must reflect all of the claimant's impairments and limitations supported by the record, *Podedworny v. Harris,* 745 F.2d 210 (3d Cir.1984), the ALJ did not err in rejecting a response to a hypothetical incorporating additional limitations that are not supported by the medical evidence. *See Jones v. Barnhart,* 364 F.3d 501, 506 (3d Cir. 2004) (ALJ had authority to disregard a vocational expert's response to a hypothetical inconsistent with evidence).

To the extent Plaintiff argues that the ALJ should not have accepted the vocational expert's testimony regarding Plaintiff's ability to perform the aforementioned jobs because it did not adequately encompass the ALJ's residual functional capacity limitation on depth perception, the argument is similarly meritless. Since the ALJ's hypothetical question properly included all of Plaintiff's well-supported limitations, he was free to accept the testimony of the vocational expert as to Plaintiff's ability to perform particular jobs. *See Rutherford v. Barnhart*, 399 F.3d 546, 553-554 (3d Cir. 2005). The ALJ, therefore, properly accepted the vocational expert's testimony regarding Plaintiff's ability to perform the above-mentioned jobs despite his difficulties with depth perception.

**VI.      CONCLUSION**

22

Based on the foregoing, Plaintiff's motion for summary judgment (Doc. No. 6) is denied.  Defendant's motion for summary judgment (Doc. No. 8) is granted. The decision of the ALJ is affirmed

An appropriate Order follows.

BY THE COURT:

_s/Nora Barry Fischer_
Nora Barry Fischer
United States District Judge


Dated:     May 10, 2010
cm/ecf:    All counsel of record.